FRANCES N. EVANS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; MATINDE P. EVANS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Evans v. Commissioner
Docket Nos. 9541-79, 9544-79.
United States Tax Court
T.C. Memo 1982-700; 1982 Tax Ct. Memo LEXIS 45; 45 T.C.M. (CCH) 249; T.C.M. (RIA) 82700; November 30, 1982. Matinde P. Evans, pro se. John E. Becker, Jr., for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Addition to
Tax
Docket No.
Petitioner
Year
Deficiency
Sec. 6653(b) [1]
9544-79
Matinde P. Evans
1975
$44,790.02
$22,395.01
1976
47,188.42
23,594.21
9541-79
Frances N. Evans
1975
44,790.02
22,395.01
1976
47,188.42
23,594.21
*46 Due to a concession, [2] the issues for decision are 1) whether petitioners realized unreported gross income from theft in the amounts of $110,704.04 and $117,688.84 for the years 1975 and 1976, respectively, 2) whether petitioner Matinde P. Evans is liable for the additions to tax under section 6653(b) for the years 1975 and 1976 and 3) whether petitioner Frances N. Evans is an innocent spouse under the provisions of section 6013(e) for the years 1975 and 1976. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein by reference. Petitioner Frances N. Evans resided at Baldwin, New York, at the time the petition in docket no. 9541-79 was filed. Petitioner Matinde P. Evans, the husband of Frances N. Evans, resided at Allenwood Federal Prison Camp, Montgomery, Pennsylvania, at the time the petition in docket no. 9544-79 was filed. During the years 1975 and 1976, Matinde Evans maintained the following checking accounts: Bank
Account #
Account in the Name Of
United Americas' Bank
430-8950
Akinyi Realty Company
Chase Manhattan Bank
0100058452
Matinde P. Evans
Citibank
0413-7725
Akinyi Enterprises
Bankers Trust Company
41671935
Akinyi Enterprises
*47 The signature card for account number 430-8950 at the United Americas' Bank was signed by both petitioners herein and the father of Matinde Evans, Price H. Evans, Sr. Frances Evans, however, has never drawn any checks on this account. Frances Evans was not a signatory on any of the other three accounts. Akinyi Realty Company was a sole proprietorship of Matinde Evans designed to manage various real estate holdings. During 1975 and 1976, Akinyi Realty Company managed the following apartment houses: 1331-1335 5th Avenue, Manhattan (this property was purchased from petitioners by the City of New York in June, 1975); 267 W. 126th Street, Manhattan; 1348-1352 Clinton Avenue, Bronx; 41 W. 184th Street, Bronx; 1017 Intervale Avenue, Bronx; and 920 Prospect Avenue, Bronx. Frances Evans was the record owner of the last three named properties but did not participate in the management of any of these properties at that time. Expenses of maintaining, renting and paying down the mortgage on these apartment buildings in 1975 and 1976 were paid out of funds deposited in the four checking accounts mentioned above. During 1975 and 1976, Matinde Evans deposited stolen checks worth $110,704.04 *48 and $117,688.84, respectively, into the four checking accounts mentioned above. With but few exceptions, these checks were United States Government checks which had been intended for persons and organizations affiliated in some way with the Veterans Administration Hospital located on West Kingsbridge Road in the Bronx, New York. Matinde Evans forged the names of the payees on many and possibly all of these checks prior to depositing them. Petitioners did not report any of the proceeds of these checks as income in 1975 or 1976. On March 14, 1978, Matinde Evans was convicted by a jury of "unlawfully, willfully, intentionally and knowingly combining, conspiring, confederating and agreeing with others to defraud the United States by stealing and forging United States Treasury checks which had been dispatched by mail and also giving false testimony before the Federal Grand Jury." The perjury conviction related to Matinde Evans' false testimony that he never forged the endorsement of the payee's name on any of the stolen checks. In his statutory notice of deficiency, respondent determined that petitioners were required to report the proceeds of the stolen checks as income in 1975 *49 and 1976. The checks forming the basis of respondent's deficiency notice were, with few exceptions, the same checks underlying Matinde Evans' criminal conviction. Petitioners filed joint income tax returns for the taxable years 1975 and 1976. Both petitioners signed their names to the 1975 return. Matinde Evans signed both his name and his wife's name of the 1976 return. Frances Evans did not intend to file a separate return in 1976. Frances Evans did not participate in the preparation of either the 1975 or 1976 joint return. On their 1975 return, petitioners reported the receipt of $14,400 of rental income from a building they owned at 267 W. 126th Street, Manhattan. They also reported the following expenses attributable to that building: Cleaning
$ 143
Insurance
1,102
Janitor and heating
2,400
Legal and accounting
150
Office supplies
181
Salaries
1,393
Utilities
129
Depreciation
700
Total
$6,198
On March 8, 1976, the Supreme Court of New York ordered the Borough Superintendent of Manhattan to demolish this building. On their 1976 return, petitioners reported the receipt of $12,837 of rental income from a building at 1348-1352 Clinton *50 Avenue, Bronx. They also reported the following expenses attributable to that building: Cleaning
$ 7
Insurance
528
Legal and accounting
190
Management fees
456
Plumbing
5,739
Electrical
682
Woodwork
4,459
Painting
1,069
Glass
738
Taxes and licenses
466
Telephone
82
Utilities
523
Mortgage
240
Depreciation
800
Total
$15,979
On January 26, 1978, the City of New York ordered this building vacated as unfit for human habitation. At his criminal trial, Matinde Evans testified that he was not alone in the theft and cashing of the stolen checks here at issue. He stated that he did not steal these checks but that he received the checks from an individual known to him by the names of Mike, Mario Harper or "Buggy Whip," that he deposited the checks in his checking accounts and that he withdrew large cash amounts from these accounts to pay back mike as Mike needed money (usually in amounts ranging from $500 to $2,500). He testified that his sole benefit from this check cashing operation was the use of the money while Mike did not need it. Subsequent to his criminal trial Matinde Evans told the Assistant United States Attorney and his own lawyer *51 that he had in fact received 40 percent of the proceeds of each stolen check and that the remaining 60 percent went to other people. Although Matinde Evans was indicted with unnamed co-conspirators, no other individual, with the exception of Matinde Evans' brother, Harram Evans, has ever been located or identified as having participated in the scheme to steal and cash government checks. The identity of the actual thief in this scheme was not established at the criminal trial. Harram Evans never received any compensation for any assistance he may have rendered to his brother in connection with the check cashing scheme. Harram Evans was granted immunity from criminal prosecution with respect to the stolen check scheme, but was never called to testify at his brother's criminal trial. From January 1, 1975, to August, 1976, petitioner Frances Evans resided in a low-income housing project in Long Island City, New York. In August 1976, Frances Evans and her husband purchased a seven-room, one-story house with a concrete patio, built-in pool and detached utility building in suburban Baldwin, New York, for $49,000. To facilitate this purchase, petitioners obtained a $36,750 mortgage *52 from Beacon Federal Savings & Loan Assn., Baldwin, New York. On their residential loan application, Frances Evans, in order to induce the bank to lend the money, falsely stated that she was then employed by KEI Electronics, 245 7th Avenue, New York, New York, as a secretary earning $700 per month. Frances Evans was in fact unemployed during 1975 and 1976. Frances Evans still resided at the Baldwin house at the time the petition in docket no. 9541-79 was filed on July 5, 1979. She has since moved from that house to another equally nice house. OPINION The first issue for decision is the correctness of respondent's upward adjustments in petitioners' income of $110,704.04 in 1975 and $117,688.84 in 1976. Respondent argues the above amounts constituted the gross proceeds of stolen government checks deposited in checking accounts controlled by petitioner Matinde Evans. According to respondent, these amounts constituted gross income to petitioners when deposited and were not reported at all by petitioners on their 1975 and 1976 tax returns. Petitioners concede that they had income from stolen government checks in 1975 and 1976 and further do not dispute the correctness of *53 the gross amount of stolen checks determined by respondent. What petitioners do dispute, however, is that they had taxable income in the amount of 100 percent of the proceeds of the stolen checks. Petitioners argue that Matinde Evans was a member of a conspiracy, that his cut was only 10 percent of the proceeds of the stolen checks and that consequently he only had stolen check income in the amount of 10 percent of respondent's figures. In addition, petitioners claim that there is in fact not even a deficiency as regards that 10 percent cut because this cut was reported on their 1975 and 1976 tax returns as rental income on buildings which were in fact vacant and non-income-producing in those years. Petitioners bear the burden of proof on the issue of the deficiencies determined by respondent. Rule 142(a). On this record, we hold that they failed to carry that burden. In order to show that Matinde Evans only received 10 percent of the proceeds of the stolen checks, petitioners adduced testimony from Matinde Evans and Harram Evans along with introducing the transcript of and proceedings following the criminal trial. We will examine each of these items of evidence separately. *54 First, we decline to accord any evidentiary weight to the testimony of Matinde Evans concerning the operation of an alleged conspiracy of several individuals to steal and then have the petitioner cash government checks. Petitioner is a convicted perjurer. He has told so many different stories at so many different times in describing how he obtained and later distributed to co-conspirators the proceeds of these checks that we feel incapable of now determining which, if any, of these stories is the correct one. For example, in connection with his cut of the loot, petitioner has at various times stated that 1) he paid all the proceeds of the stolen checks back to the person(s) who brought these checks to him (criminal trial), 2) he retained 40 percent of the proceeds of such checks as a commission (post-criminal trial) and 3) he retained 10 percent of the proceeds of such checks as a commission (instant trial). Second, we accord no evidentiary weight to the testimony of Harram Evans, Matinde Evans' brother. In connection with the stolen check cashing scheme, Harram Evans testified that he occasionally would act as a go-between or bagman between his brother and several other *55 individuals. He stated that he would pick up stolen government checks on which the payee's name had in all cases already been forged from two individuals and deliver these checks to his brother. Later he would carry cash back to the check thieves from his brother. Harram said he received no compensation for this service but he recalls that his brother's commission in the scheme was in the neighborhood of 20 or 30 percent. We are unconvinced by this testimony for several reasons. First, Harram Evans has been granted immunity from criminal prosecution in connection with this scheme. Thus, he had no fear of criminal prosecution when he described his participation in and knowledge of the workings of this alleged conspiracy. Second, Harram Evans is petitioner's brother and does his brother a big favor by attempting to corroborate in many respects Matinde Evans' story. Third, Harram's story lacks credibility. He testified that all government checks he picked up from third parties already had the payee's indorsement forged on them. At the criminal trial a handwriting expert testified that Matinde Evans did in fact forge the indorsements on many of these checks and may have forged *56 the endorsements on some or all of the others. This testimony clearly formed the basis of Matinde Evans' perjury conviction for testifying to the grand jury that he had never forged a payee's name on these checks. While it is possible that Harram Evans only dealt with the checks (assuming there were any) on which Matinde Evans did not forge the payee's signature, in the circumstances of this case we think that improbable since logically there would be no reason for Harram to be employed only on errands involving pre-forged checks. Accordingly, we find no probative value in Harram's testimony. The third alleged support for petitioners' contention that Matinde Evans did not keep all the money from the stolen checks is the fact that petitioner was convicted of conspiracy with other unnamed co-conspirators. Petitioners argue that if Matinde Evans was indeed involved in a conspiracy with others, it would strain credulity to find that the other conspirators let him keep all the money. See . While we agree with petitioners that it is highly unlikely conspirators would continue to deal with each other over an extended period *57 of time if their ill-gotten gains were not regularly divided, we are unpersuaded in this case that there actually was a conspiracy. Such a finding is not inconsistent with Matinde Evans' criminal conviction for conspiracy. It should be noted that Matinde Evans is the only individual who was ever prosecuted for the theft and cashing of these checks. The actual thief or method of theft was never determined at the criminal trial. Apparently, Matinde Evans was indicted and convicted of conspiracy because the government could only tie petitioner to the cashing of the checks. It had no evidence to rebut petitioner's argument that other individuals actually stole the checks. In the instant case the burden of proof is on petitioners to prove that there were other individuals involved in the stealing of the checks and if so, how much those individuals received. On the record before us we conclude that petitioners have not proved that persons other than Matinde Evans were involved in this scheme. No credible evidence in the record suggests otherwise. Consequently, we hold that petitioners realized gross income from the cashing of stolen government checks in 1975 and 1976 in the full *58 amount determined by respondent. In order to establish the amount of the deficiency, however, the question of whether petitioners reported any of their illegal income in 1975 and 1976 remains to be resolved. Petitioners contend that they reported all of their illegal income in 1975 (i.e., 10 percent of the proceeds of stolen checks) as rental income on a property they owned at 267 W. 126th Street, Manhattan, which property was essentially vacant that year and only leased as a social club to ex-addicts for $12 per year. Petitioners argue they reported all of their illegal income in 1976 as rental income on a property they owned at 1348-1352 Clinton Avenue, Bronx, which building was uninhabited during that taxable year. On their returns petitioners reported gross rental income from those building in the amounts of $14,400 and $12,837 in 1975 and 1976, respectively. As evidence to support their argument that these buildings actually produced no rental income in 1975 and 1976, petitioners introduced several documents, none of which we feel is sufficient to meet their burden of proof on this issue. First, they introduced a letter from an agency of the City of New York stating *59 that on March 8, 1976, the Supreme Court of New York had ordered the demolition of the building on 126th Street. This document does not show, however, what condition the building was in during 1975, whether there were tenants living there at the time or any other fact which would suggest that petitioners did not in fact actually collect $14,400 of rent from this building in 1975. Second, they introduced a purported lease of this entire building for $12 per year to a social club commencing April 1, 1975. In light of Matinde Evans' penchant for forgery, however, we are extremely dubious of this document, the signatures on which are not notarized. Third, petitioners introduced a notice to vacate the building at 1348-1352 Clinton Avenue, Bronx, issued by the City of New York on January 26, 1978. Far from suggesting that this building was uninhabited in 1976, we think it implies that the building was inhabited immediately prior to its issuance. In any case, it does not convince us that this building did not produce gross rental income in 1976. Our failure to believe petitioners' story that these buildings were vacant in 1975 and 1976 is buttressed by the entries on petitioners' *60 tax returns claiming cleaning, janitor and/or maintenance expenses in connection with these buildings in those years. In fact, the various expenses claimed in connection with these buildings totaled $6,198 and $15,979 for 1975 and 1976, respectively. That petitioners would incur such substantial expenses seems inconsistent with their contention that the buildings were then empty. Additionally, the rental income figures reported for these buildings do not precisely match the 10 percent of stolen check proceeds petitioners now claim was their illegal income. The discrepancies suggest to us that the rental income figures have nothing to do with the illegal income in those years. We therefore hold that no part of petitioners' illegal income was reported by them in 1975 or 1976. Consequently, respondent's determined deficiencies are held to be correct. The next issue for decision is whether Matinde Evans is liable for the additions to tax for fraud in both 1975 and 1976. To prevail, respondent must prove by clear and convincing evidence that any part of any underpayment was due to fraud. Sections 6653(b) and 7454(a); Rule 142(b). The existence of fraud is a question of fact *61 to be resolved upon consideration of the entire record. , affd. by unpublished order . To prove fraud, respondent must show that the taxpayer acted with specific intent to evade a tax believed to be owing. . Fraud may not be presumed or imputed; however, since direct evidence of fraud is seldom available, respondent may meet his burden of proof through circumstantial evidence. . In the instant case we are persuaded of the existence of substantial underpayments due to fraud for each of the taxable years in issue. In the first place, irrespective of the burden of proof, [3] it is clear that petitioner understated his income by very large amounts in both 1975 and 1976. A consistent pattern of underreporting is by itself strong evidence of fraud. , affd. without published opinion . *62 Secondly, at trial Matinde Evans stated that he knew illegal income was taxable and he therefore tried to report such income in 1975 and 1976. While we do not believe that second part of this statement, we consider petitioner's testimony that he attempted to report illegal income a sufficient admission to show that his failure to report substantial amounts of illegal income was not done because he did not believe tax to be owing thereon. Petitioner's repeated attempts to conceal his illegal activities, including the giving of false testimony both before the grand jury and at his criminal trial are other strong indicia of fraudulent intent. . Further, he testified at the instant trial that he only entered into this scheme to cash stolen checks because he was told that his detection would be impossible -- i.e., that the scheme was, in his words, "fool proof." Taken together, we believe these facts prove an understatement due to fraud in each of the taxable years 1975 and 1976. Accordingly, the additions under section 6653(b) relating to petitioner Matinde Evans *63 are sustained. The final issue for decision is whether petitioner Frances Evans was an innocent spouse and should therefore be relieved of liability for the determined deficiencies in 1975 and 1976. Section 6013(e)(1) provides: (e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.-- (1) IN GENERAL. Under regulations prescribed by the Secretary, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, *64 penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. The burden of proof in an innocent spouse case is on the taxpayer to show that he/she satisfies each of the three conditions of section 6013(e)(1). Rule 142(a); . Preliminarily, we must resolve the issue of whether Frances Evans in fact filed a joint return with her husband in 1976. We have found as a fact that in 1976, unlike in 1975, Frances Evans' name was signed to the purported joint return by her husband. Petitioners suggest that this evidence alone may relieve Frances Evans of joint liability. That, however, is not the case. See , affd. . When a spouse signs the taxpayer's name to a purported joint return, the burden of proof is on the taxpayer to show that this signature was not authorized and that the taxpayer did not intent to file a joint return. When a spouse files a joint return without the taxpayer's objection and no separate return is filed it is presumed that *65 the joint return was filed with the tacit consent of the taxpayer. ;. In the instant case, Frances Evans has said little that would indicate she did not intend to file a joint return either in 1975 or 1976.She stated that she left the preparation of tax returns to her husband and signed the 1975 return on his request; [4] she did not sign the 1976 return because she was never asked to. Both the 1975 and 1976 returns reported income from rental properties she owned. Thus, past practice indicates her consent to filing joint returns and, although not conclusive, the inclusion in the return of her income and deductions is evidence that a joint return was intended. . She apparently gave no instructions to her husband not to file their usual joint tax return in 1976 and gave no other outward sign that she desired to change their prior practice. On these facts, we hold that the 1976 return at issue was indeed a joint return of petitioners. *66 Turning to the innocent spouse question, the respondent concedes that, should we find the deficiencies in tax that he determined, Frances Evans has met the first test of section 6013(e)(1) -- the 25 percent understatement test. Respondent argues, however, that Frances Evans cannot satisfy either of the remaining two tests of section 6013(e)(1)(B) and (C). Respondent contends that Frances Evans both had reason to know of the substantial omissions of income and significantly benefited from the understated income. We conclude that Frances Evans is not entitled to the relief provided by section 6013(e)(1) because she has not met the test of section 6013(e)(1)(C). [5] The evidence suggests that she in fact significantly benefited from her husband's stolen check cashing scheme. First, Frances Evans was benefited by her husband's application of some of the illegal income to maintain, insure and pay down the mortgage on several rental apartment buildings she owned. Second, and more importantly, in mid-1976 she moved from a low-income housing project in New York City to a seven room suburban house with built-in swimming pool and patio. It is clear that Frances' lifestyle improved *67 dramatically in 1976, about a year after funds began coming in from the illegal scheme. On this record we can only conclude that the proceeds of the illegal scheme supported her increased affluence. Petitioners attempt to explain away the purchase of the Baldwin house in 1976 by arguing that the down-payment for that house was made with money left over from a 1972 medical malpractice suit recovery of roughly $36,000. Beyond their own testimony, petitioners introduced no evidence corroborating the existence of such a recovery. We are unconvinced any such recovery existed for two reasons: First, we found neither petitioner to be a credible witness. Matinde Evans is a convicted perjurer. Frances Evans admitted she lied about her sources of income to the bank to obtain mortgage financing for the Baldwin house. In light of their past behavior, we are not convinced petitioners were telling the truth at the instant trial. Secondly, the story itself lacks credibility. If Frances Evans had a $36,000 recovery in 1972, why would she stay in a low-income housing *68 project for four more years before moving to improve her lifestyle? While there might be an explanation for such conduct, petitioners offered none. In summary, we find that Frances Evans substantially benefited from the unreported income in 1975 and 1976 and that it would not be inequitable to hold her liable for the determined deficiencies. See section 6013(e)(1)(C). Decisions will be entered for the respondent in docket no. 9544-79 and under Rule 155 in docket no. 9541-79.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years in issue. All references to Rules are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent has conceded that petitioner Frances N. Evans is not liable for the additions to tax under section 6653(b).↩
3. Matinde Evans' admission both to the Assistant United States Attorney and his own lawyer after the criminal trial that he retained 40 percent of the proceeds of the stolen checks we consider alone sufficient affirmative proof by respondent of a substantial underpayment.↩
4. She makes no argument this signature was obtained by duress.↩
5. We express no opinion regarding whether she met the test of section 6013(e)(1)(B), a much more difficult question.↩